**2026 UT App 101**

# THE UTAH COURT OF APPEALS

BLUFFDALE CITY,
Appellee,
*v.*
AARON VERIVE,
Appellant.

Opinion
No. 20250757-CA
Filed July 2, 2026

Third District Court, West Jordan Department
The Honorable John Nielsen
No. 251902424

Nicolas C. Wilde, Attorney for Appellant

Eric R. Lemus and Samantha B. Smith,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

HARRIS, Judge:

¶1     Following a bench trial, Aaron Verive was convicted of
four class B misdemeanors: two counts of unlawful detention and
two counts of domestic violence in the presence of a child. Verive
appeals his convictions, arguing that (1) the evidence was
insufficient to support his convictions, (2) the trial court erred by
admitting evidence of uncharged acts, and (3) the prosecutor
should not have been allowed to argue that Verive's refusal to
speak with police at his residence could be used as evidence of his
consciousness of guilt. For the reasons that follow, we discern no
reversible error and therefore affirm his convictions.

BACKGROUND[1]

*The Incident*

¶2    In the fall of 2024, Verive and his wife, Amelia,[2] were in the process of divorcing. At this time, the couple had been married for about seven years and had two children, ages two and four. Amelia had recently moved into her parents' house in South Jordan with the children, while Verive was still living in the couple's previous residence in Bluffdale.

¶3    One day during this time period, Verive, Amelia, and the children "went to see [Verive's] daughter from a previous marriage," and they "took one car." That evening, after the visit, Amelia drove to Bluffdale to drop Verive off at his residence. When they got there, Verive told Amelia that "he'd like [her] to come inside the house and talk for a bit." Amelia agreed and followed Verive through the garage and into the kitchen, while the children remained in the car in the driveway.

¶4    While inside, Verive told Amelia that "he wanted to try to save the marriage." Amelia later said that during this conversation, Verive "was passionate because at first he just asked [her] to . . . give it a chance and try to work it out" but after Amelia "said no," the conversation then "got a little more emotional." At that point, Amelia "said [she] wanted to leave." But Verive "kept saying [she] should stay and talk more." Amelia then "tried to leave through the door that led to the garage," but Verive "kept

---

1. "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings; we present additional evidence only as necessary to understand the issues on appeal." *Bountiful City v. Sisch*, 2023 UT App 141, n.1, 540 P.3d 1164 (cleaned up).

2. A pseudonym.

convincing [her] to stay." Amelia then told Verive that "the [kids were] in the car" and that she "need[ed] to just get to them." Verive said he would come and "stay in the car with [Amelia] and continue to talk." But when Amelia again tried to leave through the garage door, Verive "stood in the way of the door" and put his hand on the doorknob. "[A]t some point he did open the door for [her]," as if "inviting [her] to leave," but he said, "I will be in the car with you until I'm done talking to you." The couple kept talking, and eventually the "police [were] brought up," and Amelia said, "Fine. I'll call them." She took her "phone out to call and he tried to grab it, but [she] was able to put it away." Verive then "[c]losed the door that led to the garage." They "talked for [about] a minute more and then [Amelia] said [she] was done talking and then [she] left through the other door." In total, the couple's conversation lasted "20 to 25 minutes."

¶5      After Amelia left the house, she "ran to [the] car" and got in, "and then [Verive] came out through the garage door and he ran to the car." When Amelia "saw him, [she] tried to leave immediately." She "backed out of the driveway" and "was going to go forward," but he "stood in front of the car and so [she] had to reverse" for the distance of "[p]robably four or five townhouses" "to go out of the neighborhood" a different way. The children were in the car the entire time, but Amelia was "not sure" if the children "would . . . have been able to see what [was] going on outside the windows of the car" because "it was dark and they were in the back" seat.

¶6      Amelia then "headed straight to [her] house in South Jordan." Verive "called [her] a minute later," and Amelia "didn't pick up," but he called again "right away and [she] picked up then." Amelia remained on the phone with Verive for the entire drive home, which "usually takes 15 minutes," and for about another five minutes after that.

¶7 A few minutes after the phone call ended, Amelia "was in [her] bedroom upstairs and [she] heard the garage door." She looked out the window and saw that "it was [her] parents' car getting into [the] garage." Then, about three minutes after that, Verive "came into [Amelia's] bedroom," apparently having come "into the house through [the] garage door." Amelia "asked him to come downstairs," and he agreed.

¶8 While downstairs, Verive attempted to continue "the same conversation" about how, in his view, the couple "didn't try to save the marriage and [they] should have." Amelia "asked him to leave . . . because [she] was kind of drained," and "he told [her] he would leave if [she] promised . . . to get on a phone call with him while he [drove] back and [she] told him [she] would." But he didn't leave. Amelia "then told him [she'd] call 911" if he continued to refuse to leave. When he still did not leave, Amelia called 911. It was only after she began to explain the situation to the 911 operator that Verive left. Then, when Amelia had finished her call with the 911 operator, Verive called her again, and they "were on the phone for [another] 15 minutes."

¶9 In response to Amelia's 911 call, police officers arrived at Verive's residence in Bluffdale. Several officers, all in uniform, went "to the front entrance of the residence and knocked both on the door and on a large window that opens to the front living room of the residence." One of the officers (Officer) was "able to see into the window of the home" and observed Verive "standing in the living room area." Verive saw Officer and "made eye contact." Officer "motioned to [Verive to] open the door," but Verive refused to do so; instead, he "opened . . . an interior door" and "went through [it] and shut the door behind himself."

*The Trial*

¶10 Later, Bluffdale City (the City) charged Verive with four class B misdemeanors: two counts of unlawful detention and two

counts of domestic violence in the presence of a child. One unlawful detention count concerned the incident in which Verive blocked Amelia from exiting the door to the garage in Verive's Bluffdale residence, and the other concerned the incident, a few minutes later, in which Verive blocked Amelia from driving down the street. To obtain convictions for unlawful detention, the City needed to prove that Verive "intentionally or knowingly" "detain[ed] or restrain[ed]" Amelia against her will. *See* Utah Code § 76-5-304(2)(a). The two counts of domestic violence in the presence of a child heavily depended on the unlawful detention counts. For those counts, the City needed to prove that Verive had "commit[ed] an act of domestic violence in the presence of a child." *Id.* § 76-5-114(2)(c) (2024). At the time of the events in question, "domestic violence" was statutorily defined as including unlawful detention. *See id.* § 77-36-1(4)(b)(xiv) (2024). The case proceeded to a bench trial.

¶11     At trial, the City presented testimony from Amelia and Officer, who both testified consistently with the events recounted above. During Amelia's testimony about the discussion she had with Verive in the South Jordan house, Verive's attorney (Counsel) objected on relevance grounds, arguing that the South Jordan events occurred "in a different city." The City responded, arguing that evidence of Verive's behavior in South Jordan was "intrinsic evidence" about events that were "inextricably intertwined with" the events underlying the charged crimes. After a brief back-and-forth between Counsel and the City, the court agreed with the City and overruled the objection.

¶12     Later, during Officer's testimony, the City asked him to describe Verive's "response when the police knocked on his door." Counsel lodged an objection at that point, asserting that Verive's response to the officers' visit was not "relevant to the elements of the charges" pending against Verive, and arguing that the City's "line of questioning" was "simply directed towards . . . [Verive's] credibility." In response, the City offered a reason why

Verive's response to the police visit was relevant: that it went to Verive's "consciousness of guilt." And the City added an observation regarding the testimony's admissibility, stating that Verive's reaction was "a non-custodial pre-*Miranda* silence so it [could] constitutionally be admitted to show consciousness of guilt when he evaded speaking with police officers." Counsel did not respond to this observation, and the court then stated as follows: "Okay. Overruled."

¶13    After the City rested its case, Verive testified in his defense. His testimony contradicted Amelia's in various ways. He testified that while he and Amelia were talking in the Bluffdale residence, he "let her know" that he was going to shut the door because it was cold, and "she didn't disagree with [him] shutting the door." He also stated that he didn't "remember blocking the door in any way." And regarding the incident involving the car, he denied stepping "[d]irectly in front" of the car, and he offered his view that Amelia could have simply driven around him.

¶14    During the City's closing argument, the prosecutor claimed that there was "a conflict in the evidence," and she argued that Amelia's version of events had "far more credibility" than Verive's. And later, the prosecutor argued that Verive's conduct at the South Jordan house was relevant to Verive's "state of mind" because there "[h]e acknowledge[d] . . . that this was a conversation he wanted, not her."

¶15    Counsel then argued that the City had not "met the elements of an unlawful detention," because of the witnesses' conflicting accounts and because Amelia "had [an] opportunity to leave and she took that opportunity" in both instances.

¶16    In the City's rebuttal argument, the prosecutor referenced the fact that Verive had refused to speak with officers who visited his residence. In that regard, she stated that "it's exceedingly rare for a prosecutor to be able to comment on a defendant's silence,"

but she offered her view that she was "able to do that constitutionally here," and she urged the court to "weigh that heavily" in assessing Verive's "consciousness of guilt." In particular, she argued that in "considering credibility," the court should take into account that Verive was "a person who went out of his way to avoid speaking with law enforcement on that occasion because he knew what he had been up to that day and he knew the likelihood that it was not going to go well for him."

¶17 After the closing arguments, the court called for a recess so that it could have "a few moments to deliberate." Later, the court found Verive "guilty as charged." It reasoned that Amelia's version of the "story ma[de] the most sense of the totality of the evidence," and it explained its reasoning as follows:

> [Amelia] wanted to go out the kitchen door of the garage [and] end the conversation, [and Verive] blocked her or imposed a condition she didn't want. That's an unlawful detention because he interfered with her freedom of movement.
>
> She then went out the front door, got in the garage, started to leave, he wanted to continue the conversation and she . . . turned out to drive straight down the street. He stood in front of her, wouldn't let her, wanted to continue the conversation. She had to back up and away, again, interfering with her freedom of movement.
>
> With the children present, the definition of "in the presence of a child" includes "whereas a child may see or hear an act" and, again, that they were cohabitants. Undisputedly then I believe all the elements are met. And then it also sheds further light on his mental state that he followed her all the

way to her parents' house in South Jordan and then refused to speak with police when they came.

¶18 The court then sentenced Verive to 180 days in jail on each charge, with the sentences to run concurrently, but it suspended the jail sentences and placed Verive on "good-behavior" court probation, with conditions, for one year.

ISSUES AND STANDARDS OF REVIEW

¶19 Verive now appeals his convictions, and he asks us to consider three issues. First, he argues that the evidence was insufficient to support the convictions. "In the context of a bench trial, when a defendant contends the evidence was insufficient to support a conviction, we review the court's findings for clear error." *Bountiful City v. Sisch*, 2023 UT App 141, ¶ 10, 540 P.3d 1164 (cleaned up). "And in such situations, we must sustain the trial court's judgment unless it is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *Id.* (cleaned up).

¶20 Second, Verive claims that the trial court erred in admitting evidence of uncharged acts, specifically including evidence of his conduct in South Jordan later in the evening. "Trial courts have broad discretion to admit or exclude evidence, and we will disturb an evidentiary ruling only for an abuse of discretion." *State v. Tuinman*, 2023 UT App 83, ¶ 51, 535 P.3d 362 (cleaned up).

¶21 Finally, Verive takes issue with the prosecutor's argument that his pre-arrest silence—when officers knocked on his door— could be used against him as evidence of consciousness of guilt. In response, the City first asserts that Verive failed to properly preserve for appellate review any challenge to the court's consideration of this evidence for this purpose. As discussed below, we agree with this assertion. Accordingly, we review Verive's challenges associated with this issue only for plain error

and ineffective assistance of counsel, both of which are arguments made for the first time on appeal and thus are considered here in the first instance as a matter of law. *See State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416 ("Claims for plain error and ineffective assistance of counsel present questions of law, which we determine in the first instance as a matter of law.").

## ANALYSIS

### I. Sufficiency of the Evidence

¶22 Verive first asserts that the City failed to present sufficient evidence to support a conviction on the unlawful detention counts, a circumstance that, if true, would mean that the City had also failed to present sufficient evidence on the domestic violence counts. The relevant statute states, "An actor commits unlawful detention if the actor *intentionally or knowingly*, without authority of law, and against the will of an individual, *detains or restrains* the individual." Utah Code § 76-5-304(2)(a) (emphasis added).

¶23 Verive makes two arguments in this regard. First, he claims that the City did not present sufficient evidence that he "detain[ed] or restrain[ed]" Amelia, as required by the unlawful detention statute. *See id.* And second, he challenges the City's mental state evidence, arguing that the City did not present sufficient evidence that he "intentionally or knowingly" committed unlawful detention. *See id.* We address Verive's arguments, in turn, and reject them both.

### A. Detain or Restrain

¶24 In asserting that he did not detain or restrain Amelia, Verive makes two claims, both of which are factually correct but legally infirm. First, he argues that he could not have detained or restrained Amelia because, in both instances, he only stood in her way momentarily. Second, he argues that he could not have

detained or restrained Amelia because, in both instances, Amelia had an alternative option to exit the relevant location.

¶25 With regard to Verive's first contention, it is well-settled that the unlawful detention statute—as opposed to the more stringent kidnapping statute—does not set a minimum time or duration of the detention. We discussed this in *State v. Wilder*, a case in which an appellant argued that there was insufficient evidence to support a conviction for unlawful detention because "the ten seconds during which he pulled the victim by her hair was too brief to satisfy the statute." 2016 UT App 210, ¶ 20, 387 P.3d 512. We rejected this argument and concluded that, on those facts, a jury question was presented as to whether the appellant had detained or restrained the victim. *See id.* ¶ 22. We compared the text of the unlawful detention statute—which *does not* have a time-related provision—with the text of the kidnapping statute——which *does* have such a provision. *See id.* ¶ 20. To prove kidnapping, a prosecuting entity must prove that a defendant detained or restrained the victim "for any substantial period of time." *Id.* ¶ 18 (quoting Utah Code § 76-5-301(2)(a)). But this "substantial period of time" language does not appear in the unlawful detention statute; instead, that statute requires only that a defendant have "detain[ed] or restrain[ed] the individual." *See id.* (quoting Utah Code § 76-5-304(1) (2015) (current version at Utah Code § 76-5-304(2)(a))). Given the textual differences between the two statutes, we concluded that for unlawful detention, "the amount of time the victim was under [the d]efendant's control is of no moment." *Id.* ¶ 20; *see also State v. Finlayson*, 2014 UT App 282, ¶ 38, 362 P.3d 926 (observing that the State had no obligation "to show that [the defendant] detained [the victim] for a substantial period of time" in order to prove that an unlawful detention had occurred). Thus, the fact that Verive detained Amelia only momentarily does not mean that insufficient evidence existed to support a guilty verdict.

¶26    As for Verive's second argument, it is likewise well-settled that a defendant can detain or restrain an individual by taking actions that fall far short of "complete confinement or imprisonment." *See Wilder*, 2016 UT App 210, ¶ 21. Again, *Wilder* is instructive. There, we analyzed dictionary definitions of "detain" and "restrain," and we concluded that these definitions "imply that 'detains or restrains' refers to restriction of the victim's movement, but neither definition requires . . . complete confinement or imprisonment." *Id.* In our view, a defendant had detained or restrained a person if the defendant had "impair[ed]" the person's "ability to move freely." *Id.* ¶ 22. And we held that a jury question was presented because the defendant had "pulled the victim by her hair" for "ten seconds." *Id.* ¶¶ 20, 22. Similarly, in *State v. Ellis*, we held that a jury could reasonably return a guilty verdict on unlawful detention where the defendant had "followed [the victim] around the house throughout the day," "prevented her from using the telephone," and "twice physically prevented her from leaving the home" "through the front door." 2014 UT App 185, ¶¶ 3, 10, 336 P.3d 26.

¶27    We acknowledge Verive's point that, in both instances, Amelia had an alternative exit route. In the first instance, the residence had multiple exit routes and Verive, in the moment, was blocking only one of them. And in the second instance, there were two automobile routes away from Verive's City, and Verive was standing in the way of only one of them. But where a defendant intentionally blocks an exit route that the individual wishes to use in that moment, the defendant has detained or restrained the individual, regardless of whether there exists a different exit route that the individual might attempt to use in the future. In this situation, the defendant has "impair[ed]" the individual's "ability to move freely." *See Wilder*, 2016 UT App 210, ¶ 22; *see also State v. Sanchez*, 2015 UT App 27, ¶¶ 15, 23, 344 P.3d 191 (affirming the lower court's use of a jury instruction defining "detain or restrain" as to "keep from proceeding, delay, keep in custody, confine, control, check, repress, limit, or restrict").

¶28    In *Wilder*, we framed the relevant question like this: "whether a reasonable jury could have concluded that [the d]efendant intentionally acted, *however briefly*, to *impair the victim's ability to move freely*." 2016 UT App 210, ¶ 22 (emphasis added). That same question is the one relevant here, and on this record, that question must be answered in the affirmative. In the first incident, Amelia tried to leave Verive's residence through the door to the garage, but he "stood in the way of the door" and prevented her from doing so. By taking this action, Verive impaired Amelia's ability to freely leave through her desired exit route and—at least briefly—delayed and limited her ability to leave the residence altogether. Likewise, in the second incident, Verive "stood in front of the car," thus preventing Amelia from leaving the premises in the way she intended and forcing her "to reverse" for the distance of "[p]robably four or five townhouses" "to go out of the neighborhood" a different way. As to both instances, Verive took actions that a reasonable factfinder could determine constituted unlawful detention.

B.    Mental State

¶29    Next, Verive argues that the evidence was insufficient to show that he "acted knowingly or intentionally" in detaining or restraining Amelia. We are again unpersuaded.

¶30    We acknowledge that Verive, when he took the stand in his own defense, testified that he had "let [Amelia] know" that he was going to shut the door to the garage because it was cold, and that "she didn't disagree with [him] shutting the door so [he] shut it." He also stated that he didn't "remember blocking the door in any way." And regarding the incident involving the car, he denied stepping "[d]irectly in front" of the car and offered his view that Amelia could have simply driven around him.

¶31    But Amelia offered a much different account, thus creating a question for the factfinder as to what Verive's actual intentions

were. Regarding the first incident, she testified that she told Verive that she "wanted to leave" to "get to" the kids in the car, and that she "tried to leave through the door that led to the garage," but that Verive "stood in the way of the door" and prevented her from leaving. From this testimony, a factfinder could reasonably infer that Verive clearly knew that Amelia wanted to leave through the garage door and that he was intentionally or knowingly preventing her from doing so. And regarding the second incident, Amelia testified that as she was leaving the residence in her car, Verive ran to the car and stood in front of it. It was fairly obvious, by that point, that Amelia was attempting to leave, and a factfinder could reasonably infer, from these facts, that Verive was intentionally or knowingly attempting to prevent her from doing so. Moreover, Amelia's account—that Verive was intentionally or knowingly attempting to prevent her from leaving—was corroborated by other evidence. For instance, the fact that Verive then drove to South Jordan in an effort to continue the conversation supports the notion that he had attempted to prevent her from leaving his Bluffdale residence.

¶32    For these reasons, sufficient evidence existed to support the factfinder's determination that Verive committed unlawful detention. Accordingly, we reject Verive's contention that his conviction was against the clear weight of the evidence.

## II. Admissibility of the South Jordan Evidence

¶33    Next, Verive argues that the trial court "erred when it admitted and considered evidence that [Verive] had traveled to South Jordan following the alleged unlawful detention in Bluffdale." Specifically, Verive argues that admitting this evidence violated rule 404(b) of the Utah Rules of Evidence because the evidence "was not inextricably intertwined with the charged offenses." The City responds by arguing that the evidence was admissible intrinsic evidence because it was

"intertwined and provided important narrative value."[3] We agree with the City.

¶34    Rule 404(b) prohibits admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). But this rule "does not apply to evidence of the crime charged, because such evidence does not implicate a person's purported propensity to act in conformance with the character exhibited by the evidence." *State v. Blackwing*, 2025 UT 60, ¶ 29, 582 P.3d 829. Accordingly, this rule operates to exclude only "evidence that is *extrinsic* to the crime charged." *Id.* ¶ 24 (cleaned up). Evidence that is *intrinsic*—that is, "when there is a direct relationship between the act and the charged crime"—is "outside the scope of rule 404(b)." *Id.* ¶ 31.

¶35    Here, evidence of Verive arriving uninvited to Amelia's upstairs bedroom at her house in South Jordan, just minutes after the couple's argument at Verive's Bluffdale residence, is intrinsically connected to the charged crimes. Verive's journey to South Jordan—while on the phone with Amelia—occurred right after the Bluffdale events that formed the basis for the charges. In some sense, the phone call and trip to South Jordan were just a continuation of the events that had occurred in Bluffdale. As such, the South Jordan events are probative of Verive's state of mind during, and in the minutes following, the charged acts and therefore have a clear and direct relationship to the charged acts. The fact that Verive, in the immediate wake of the charged acts, followed Amelia to South Jordan and entered her house uninvited

---

3. The City also argues that Verive failed to properly preserve this argument for appellate review. But where "the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (cleaned up). We opt to do so here.

makes it at least somewhat more likely that he didn't want her to leave his Bluffdale residence in the first place and that he might have wanted to try to stop her from leaving there.

¶36 Accordingly, evidence of the South Jordan events is intrinsic to the charged crimes and thus outside the scope of rule 404(b). The trial court therefore did not exceed its discretion in allowing admission of that evidence during Verive's trial.

### III. Evidence of Pre-Arrest Silence

¶37 Finally, Verive argues that his Fourth and Fifth Amendment rights were violated when the court "admitted and relied on evidence that [Verive] had declined to speak to officers who arrived at his home." The City contests this argument on its merits, but it first raises a threshold issue, asserting that Verive failed to preserve this challenge for appellate review. We address the City's threshold preservation contention first, before then turning to the merits of Verive's argument.

#### A. Preservation

¶38 The preservation question here turns on whether, to what extent, and on what specific basis Verive objected to the City's efforts to admit evidence that Verive had declined to speak to police officers. Verive points out that Counsel *did* object to the City's effort to introduce this evidence. In response, the City points out that Counsel's objection was limited and consisted only of an objection on *relevance* grounds. As the City sees it, Counsel never objected on *constitutional* grounds and never opposed the City's contention that, if relevant, admission of the evidence would not offend the constitution. From this, the City infers that the trial court had no idea that there was any dispute about the constitutional admissibility of the evidence and had no idea that it needed to resolve a contested issue on that point.

¶39   Neither party disputes the basic principles of preservation. "Appellate courts generally will not consider an issue unless it has been preserved for appeal." *State v. Skinner*, 2020 UT App 3, ¶ 23, 457 P.3d 421 (cleaned up). "To preserve an issue for appeal, a party must present it to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Id.* (cleaned up). But the parties disagree about whether, on these facts, the trial court had a meaningful opportunity to rule on the constitutional admissibility of the evidence.

¶40   On this point, Verive and the City rely on different strains of our preservation caselaw to support their positions. For his part, Verive directs our attention to caselaw holding that where a trial court actually rules on an issue, the propriety of the court's ruling on that issue is preserved for appellate review. *See, e.g.*, *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (noting that where a "district court not only had an opportunity to rule on the issue . . . but in fact did rule on it," the issue is preserved for appellate review). And Verive asserts that issues can be preserved, even where the appellant failed to raise the issue, if the other side—here the City—raised the issue and provided the necessary framework for a decision. *See, e.g.*, *State v. Ramos*, 2025 UT App 70, ¶ 11 n.1, 571 P.3d 807 (holding that an issue was preserved where "the State itself [had] recited the three-part test" applicable to the issue and the trial court had ruled on the issue using that framework), *cert. denied*, 574 P.3d 525 (Utah 2025).

¶41   The City, on the other hand, directs our attention to cases holding that objecting parties must identify the particular grounds for their objection and that parties who make "an objection at trial based on one ground" have not "preserve[d] for appeal any alternative grounds for objection." *See State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867. In *Low*, for instance, the defendant objected at trial to a jury instruction on one specific ground, but on appeal he argued that the instruction was infirm for a different

reason. *See id.* ¶ 18 (stating that the defendant "never objected to the [jury] instructions for the reason that he now urges as grounds for reversal" on appeal). In that situation, our supreme court considered the issue unpreserved. *See id.* And in *State v. Centeno*, the court reiterated these principles, holding that an "objection on grounds of undue emphasis did not raise before the [trial] court the issues that [the appellant] . . . assert[ed] on appeal: that his rights to be present and to confront adverse witnesses were violated, and that the video unfairly depicted him in handcuffs." *See* 2023 UT 22, ¶ 55, 537 P.3d 232.

¶42　　In this same vein, our supreme court has made clear that a party's failure to "offer a proper objection" to the admission of evidence at trial means that the party's attempt to appeal the admission of that evidence on a basis not articulated to the trial court will be rejected as unpreserved. *See State v. McNeil*, 2016 UT 3, ¶ 21, 365 P.3d 699. In *McNeil*, the State wanted to read to the jury, at trial, the preliminary hearing testimony of a police detective regarding certain telephone calls involving the defendant. *See id.* ¶¶ 7–8. The defense objected on various grounds, including "hearsay." *See id.* ¶¶ 9–10. The trial court interjected, offering its view that the detective's testimony couldn't constitute hearsay because it had been offered in court, during a preliminary hearing. *See id.* ¶ 10. In response, the defense attorney conceded that the testimony was "not hearsay." *Id.* The court then admitted the evidence, stating that it was "not hearsay." *Id.* On appeal, the defendant attempted to challenge, on hearsay grounds, the court's admission of the detective's testimony, and the State asserted that defense counsel had invited any error at trial. *See id.* ¶ 16. Our supreme court rejected this argument, holding that the error had not been invited, but it clarified that "an error of this sort by the trial court is not invited but merely unpreserved" because the defense attorney had acquiesced to the court's statement that the testimony was "not hearsay" and had therefore not "offer[ed] a proper objection." *Id.* ¶ 21. The court thus proceeded to review the issue on appeal, but

only for plain error and ineffective assistance of counsel. *See id.* ¶ 24; *see also State v. Popp*, 2019 UT App 173, ¶ 44, 453 P.3d 657 (holding that an argument was unpreserved for appeal when defense counsel was "directly queried about whether he had any 'comment' on the State's request" that certain evidence be admitted and "responded in the negative").

¶43      In this situation, we think the City has the better of the preservation argument. To be sure, the trial court admitted the evidence on precisely the basis suggested by the City and ended up, at least to some extent, considering it in connection with its decision to convict Verive. But while Counsel lodged a *relevance* objection, Counsel did not express audible opposition to the City's contention that, if relevant, the evidence of Verive's silence could constitutionally be admitted and considered for consciousness of guilt. The City's position regarding constitutional admissibility was thus unopposed and unchallenged, and on this record we do not think the trial court had any idea that it was being asked to resolve a constitutional question. Indeed, the particular constitutional question Verive now claims was preserved here is a complex one, involving the potential reach of the plurality opinion in *Salinas v. Texas*, 570 U.S. 178 (2013), and specifically whether *Salinas* abrogated earlier precedent from this court, including *State v. Gallup*, 2011 UT App 422, 267 P.3d 289, and *State v. Palmer*, 860 P.2d 339 (Utah Ct. App. 1993). *See State v. Anderson*, 2020 UT App 135, ¶ 41, 475 P.3d 967 (noting that "neither this court nor the Utah Supreme Court has squarely addressed the impact of *Salinas* on our precedent," and concluding that an attorney "could reasonably reach [the] conclusion" that *Salinas* had "overruled *Palmer* and *Gallup*"). In this case, the trial court offered only a terse two-word response—"Okay. Overruled."—to the attorneys' back-and-forth on the topic, and the court did not make any comment specifically about the constitutional issues. As far as we can tell from our examination of the record, the court admitted the evidence not because it was making a ruling on the constitutional issue but, instead, because it overruled Counsel's

relevance objection and because the City's stated position on constitutional admissibility appeared to be unopposed.

¶44    Verive acknowledges that no stated opposition to the City's position appears in the record, but he nevertheless resists the conclusion that the constitutional challenge remains unpreserved, asserting that the trial court "overruled [Counsel's] objection without affording him an opportunity to respond." Presumably, this assertion rests on the premise that the court made a quick ruling on the matter without pausing to allow Counsel an opportunity to offer a contrary view on constitutional admissibility. For two reasons, we reject Verive's assertion.

¶45    First, even assuming the accuracy of Verive's underlying premise—that the court made a quick ruling without pausing—Counsel still had every opportunity to make a record of any objections he might have had to the City's position. Here, there is no indication in the record that the court prevented Counsel from making any argument or that it refused to afford Counsel the benefit of the record to make his position clear. Even when a court makes a quick ruling, attorneys are expected to lodge objections and, if necessary, ask for the benefit of the record to set forth any opposition they might have to a position the other side takes. Attorneys who fail to ask for the benefit of the record in a situation like this have not done enough to preserve their position.

¶46    Second, and relatedly, it is by no means clear from the record that the trial court failed to pause to allow Counsel time to register any opposition to the City's position. The cold record does not reveal how much time elapsed between (a) the end of the City's recitation of its position, (b) the court's first word ("Okay"), and (c) the court's second word ("Overruled"). Verive appears to be assuming that this all happened extremely quickly, with mere milliseconds between (a), (b), and (c). But there could well have been pregnant pauses, accompanied by non-verbal communication (e.g., eye contact) between the court and Counsel,

during which time it would have been clear that the court was affording Counsel an opportunity to chime in. The record is simply unclear on the point. Perhaps an audio recording of the hearing would have shed more light on the matter. Alternatively, an affidavit from Counsel might likewise have been informative. But these items are not contained in the record submitted to us. "When an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below," and "when crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (cleaned up).

¶47    For all of these reasons, we conclude that Verive failed to preserve for appellate review any argument related to the constitutional admissibility of evidence that he reacted with silence when police officers arrived at his residence. We therefore proceed to review Verive's appellate arguments under exceptions to our preservation rules, namely, ineffective assistance of counsel and plain error.

B.    Ineffective Assistance of Counsel

¶48    To succeed on a claim of ineffective assistance, Verive must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal to the claim; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need

not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶49    In this case, we elect to decide the matter on the prejudice prong. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up).

¶50    Verive argues that Counsel was ineffective for failing to articulate any opposition to the City's position that Verive's silence was constitutionally admissible as evidence of consciousness of guilt. And as to prejudice, Verive notes that the City emphasized this point in its closing argument and that the court, in its oral ruling, mentioned Verive's silence as one piece of evidence that contributed to the court's ultimate decision. Verive is correct that these facts are relevant to a prejudice analysis and that they can weigh in favor of a determination that prejudice exists. *See State v. Gourdin*, 2024 UT App 74, ¶ 91, 549 P.3d 685 ("When the State emphasizes evidence to this extent in closing argument, that is a very good clue that the evidence mattered."), *cert. granted*, 564 P.3d 958 (Utah 2025). But these facts do not compel the conclusion that prejudice exists, and in this case we conclude that, despite the City's emphasis and the trial court's mention of Verive's silence, Verive has not demonstrated a reasonable likelihood of a different result absent Counsel's putative error.

¶51 To properly assess whether prejudice exists, we must undertake a counterfactual inquiry, one in which we envision a hypothetical world in which Counsel did not make the putative error. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86 ("Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error."); *see also State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (cleaned up)). Here, we imagine a trial in which Counsel lodged an articulate objection to the City's position regarding constitutional admissibility, and we even assume—for purposes of our hypothetical analysis only—that the trial court sustained that objection and excluded from its analysis any consideration of Verive's silence as demonstrative of consciousness of guilt. But even indulging these assumptions, we perceive no reasonable likelihood of a different result for Verive in an alternative trial.

¶52 When we review the trial transcript—and especially the transcript of the court's ruling—in context, it becomes clear that the evidence of Verive's silence formed but a very minor part of the trial and of the court's analysis. To be sure, part of the court's analysis involved deciding whose account of events to believe— Verive's or Amelia's—and deciding what Verive's mental state was when he committed the acts in question. And as noted, the court did mention, at least in passing, Verive's silence. But the court's ruling comprises three paragraphs in the transcript, and only in the final sentence does the court make any mention of Verive's refusal to speak with police. The court first recited the facts, and it found that Verive had "interfered with" Amelia's "freedom of movement" and thus had detained or restrained her. It then determined that "all [of] the elements" of the domestic violence offenses were also met.

¶53 It was only after conclusively determining, as a matter of law and fact, that the elements of the charged crimes were met that the court—in the final sentence of its oral ruling—made this comment: "And then it also sheds further light on [Verive's] mental state that he followed [Amelia] all the way to her parents' house in South Jordan and then refused to speak with police when they came." As an initial matter, this sentence—in its entirety— feels like an aside; it is by no means clear that any of it was dispositive to the analysis that had already essentially been completed. After all, the court spoke in terms of these facts simply shedding *further* light on a matter it appeared to have already conclusively decided.

¶54 But be that as it may, it is only the final ten words of the sentence that have anything to do with the issue at hand; for purposes of our prejudice inquiry, Verive's trip to South Jordan remains relevant and something that the court was allowed to properly consider. For purposes of our analysis, then, we must assess whether there exists a reasonable likelihood of an acquittal if the court could consider (a) the facts of the two incidents at the Bluffdale residence and (b) the fact that Verive followed Amelia to South Jordan and entered her parents' house to continue the conversation but not (c) the fact that Verive refused to speak with police when they visited his residence later that night. And on that score, we simply see no possibility of a different outcome given those assumptions. As we read the court's oral ruling, its decision did not turn on whether Verive refused to speak with the police. If that fact had been removed from consideration, in our view the court would have reached the exact same result.

¶55 Accordingly, Verive has not demonstrated that any error Counsel may have committed by not lodging an objection to the City's position on the admissibility of his silence made any difference to the outcome of his trial. On that basis, we reject Verive's ineffective assistance claim.

C.      Plain Error

¶56     Next, Verive argues that the district court plainly erred when it "admitted and used the pre-arrest silence." To establish plain error, Verive must show "that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Popp*, 2019 UT App 173, ¶ 35, 453 P.3d 657. The third part of this test is analyzed in the same way as the prejudice prong from the ineffective assistance of counsel test. *See id.* ¶ 40 ("The prejudice test is the same whether under the claim of ineffective assistance or plain error." (cleaned up)); *see also State v. Bair*, 2012 UT App 106, ¶ 35, 275 P.3d 1050 ("The 'harm' factor in the plain error analysis is equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." (cleaned up)). For the reasons explained in the previous section, Verive has not demonstrated that he was prejudiced by the admission of evidence regarding his silence. Accordingly, we reject Verive's claim of plain error for the same reason that we reject his claim of ineffective assistance of counsel.

CONCLUSION

¶57     The evidence presented at trial was sufficient to support the convictions. The trial court did not exceed its discretion in admitting and considering evidence of Verive's journey to South Jordan, because that evidence was intrinsic to the charged crimes. And Verive's challenge to the court's consideration of evidence of his refusal to speak with police is unpreserved, and Verive has not shown ineffective assistance of counsel or plain error. For these reasons, we reject Verive's arguments and affirm his convictions.

———————